*April Ademiluyi, et al. v. Chizoba Egbuonu, et al.*, No. 34, September Term, 2018.  Opinion by Getty, J.

**ELECTION LAW—NOMINATIONS—NOMINATIONS BY POLITICAL PARTIES IN GENERAL**

The Court of Appeals held that the Libertarian Party of Maryland's nomination of a judicial candidate for the Circuit Court of Prince George's County was invalid, because the candidate was a registered Democrat and the Libertarian Party of Maryland's Constitution requires that candidates for the party be registered as Libertarians.

**ELECTION LAW—LIMITATIONS AND LACHES**

A voter's challenge to the qualifications of a candidate for judicial office was not barred by the doctrine of laches, where the challenge was based on the candidate's party affiliation, because there was little media attention surrounding her candidacy, documents concerning the candidate's political affiliation were in the exclusive possession of the State Board of Elections, and  Appellees brought action just one day after receiving the relevant documents through a Maryland Public Information Act  request  submitted to the State Board of Elections.

Circuit Court for Prince George's County
Case No.: CAL18-26458
Argued: September 6, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 34

September Term, 2018

_____

APRIL ADEMILUYI, *et al.*

v.

CHIZOBA EGBUONU, *et al.*

_____

Barbera, C.J.
*Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.
Watts, J. concurs in judgment only.

_____

Filed: August 29, 2019

*Greene and Adkins, J.J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Md. Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.


Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

> The State is not constitutionally barred from evincing a policy of nonpartisanship in judicial elections while nevertheless keeping the election process itself an inherently partisan affair; nor is it barred from relying on the long-established infrastructure of a political party primary to accommodate the election of candidates it desires to be selected on bases apart from partisan politics.
>
> Judge Irma S. Raker
> *Suessmann v. Lamone*,
> 383 Md. 697, 727 (2004).

Maryland's electoral process for conducting elections of circuit court judges is an imperfect hybrid. As this Court discussed in *Suessmann v. Lamone*, 383 Md. 697 (2004), this judicial electoral process is a hybrid because it is neither purely partisan nor purely nonpartisan. Circuit court judges have run in partisan elections just as other candidates on the ballot since the Constitution of 1851. An appearance of nonpartisanship was achieved when the General Assembly passed a bill in the 1941 legislative session to remove the designation of party affiliation in the listing of candidates for the office of circuit court judge on the ballot.

More significantly, perhaps, the hybrid quality exists because this judicial electoral process serves two functions. First, in order for the incumbent judge to retain his or her seat, the judge is required to be a candidate in a potentially contested election. Incumbent judges are required to run after their initial gubernatorial appointment and at the end of each fifteen-year term. The process for initial appointment includes candidates being

vetted through a judicial nominating commission.[1]  Second, the electoral process allows

for challengers, who may or may not have been vetted through the judicial nominating

commission, to file as candidates as long as they qualify under the constitutional provisions

to serve as a circuit court judge.

The issue confronting this Court in the instant appeal arises from legislation enacted

by the General Assembly in 2006 that allows non-principal parties to nominate candidates

for circuit court judge elections through whatever nomination process is required by their

party bylaws.  The critical advantage of a circuit court judge candidate nominated by a non-

principal party is that the nominee bypasses the primary election and moves directly to the

general election.[2]

---

[1] In 1970, Governor Marvin Mandel issued the first executive order that established a judicial nominating commission.  *See* http://mdcourts.gov/judgeselect.  The purpose of judicial nominating commissions is to ensure proper vetting of judicial candidates and the appointment of qualified candidates and this practice has been maintained by subsequent Governors.  *See* Exec. Order 01.01.2015.09 for the executive order that was in effect during the time period of the 2018 election.

[2] The distinction between principal and non-principal parties is based upon the amount of support a party was able to attract in the preceding Gubernatorial Election.  *See* EL § 1-101(dd), (jj), (kk); s*ee also* EL 8-202.  The term "principal political parties" is defined in the Election Law Article to encompass only "the majority party and the principal minority party."  EL § 1-101(kk).  The term "principal minority party" is defined as "the principal political party whose candidate for Governor received the second highest number of votes of any party candidate at the last preceding general election."  EL § 1-101(jj).  Whereas, a majority party is defined as "the political party to which the incumbent Governor belongs if the incumbent Governor is a member of a principal political party."  EL § 1-101(dd).  The definition further provides that "[i]f the incumbent Governor is not a member of one of the two principal political parties, "majority party" means the principal political party whose candidate for Governor received the highest number of votes of any party candidate at the last preceding general election."  *Id.*  Historically, the principal political parties within the State have been the Democratic and Republican Parties.

We are asked to determine whether the Circuit Court for Prince George's County erred by entering a preliminary injunction which prohibited the State Board of Elections ("the State Board") from certifying the ballot for the 2018 Gubernatorial General Election with April Ademiluyi listed as a candidate for circuit court judge. More specifically, we must determine whether nomination by the Libertarian Party of Maryland ("the Libertarian Party") of Ms. Ademiluyi was improper where the Libertarian Party's Constitution requires that its candidates for office be registered Libertarians and Ms. Ademiluyi was a registered Democrat. For two reasons, we concluded that Ms. Ademiluyi's candidacy was impermissible under the relevant provisions that regulate judicial elections in Maryland: (i) her candidacy is at odds with the Libertarian Party's Constitution, which requires all of its candidates for public office to be registered members of the party; and (ii) a judicial candidate's route to access the ballot is dependent upon his or her party affiliation—candidates registered with a principal party may only achieve this end through participation in primary elections.[3]

Upon learning of Ms. Ademiluyi's party affiliation through a Maryland Public Information Act ("MPIA") request, Chizoba N. Egbuonu, Luther V. Watkins, Sr., Manuel R. Geraldo, and Stella A. Grooms (collectively "Appellees"), challenged her qualifications for nomination as a circuit court judge under Maryland's election code. At a hearing before

---

[3] This procedure applies to all challengers for the office of circuit court judge. Incumbent judges who have been appointed by the Governor or have completed their fifteen-year term, pursuant to Article IV, Section 5 of the Maryland Constitution, are eligible to file in the primary election regardless of the incumbent judge's party affiliation.

the Circuit Court for Prince George's County, Ms. Ademiluyi failed to appear and therefore made no arguments. After the circuit court ordered that her name be removed from the ballot, Ms. Ademiluyi appealed to this Court and presented us with several questions for review in her appeal memorandum.[4] However, a grant of preliminary injunction falls within the circuit court's discretion and the appropriate frame of review is whether the circuit court abused its discretion in granting the preliminary injunction. *See Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 33 (2007); s*ee also Ehrlich v. Perez*, 394 Md. 691, 707 (2006).

---

[4] Ms. Ademiluyi raises three issues in her appeal memorandum:

1. Does a voter, whom is not affiliated with the Maryland Libertarian Party, have standing to challenge an alleged failure of the party members to comply with its bylaws in nominating a candidate for office?

2. Does Election Law Title 5 Candidates Subtitle 2 Qualifications § 5-201 require political party bylaws to address the party affiliation of the judicial candidates they nominate?

3. May a Circuit Court's ruling of a preliminary injunction without a hearing on the merits and an opportunity to exercise the statutory right to an appeal a [*sic*] a decision on the merits remove a candidate's name from the ballot?

Generally, court will not decide an issue "unless it plainly appears on the record to have been raised in or decided by the trial court." Md. Rule 8-131. We have previously indicated that this rule is intended,

> to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and . . . to prevent the trial of cases in a piecemeal fashion, thus accelerating the termination of litigation.

*Maryland State Bd. of Elections v. Libertarian Party of Maryland*, 426 Md. 488, 517 (2012) (quoting *Fitzgerald v. State*, 384 Md. 484, 505 (2004)).

Oral argument in the present appeal was held on September 6, 2018. That same day, we issued a *per curiam* order affirming the circuit court's grant of preliminary injunctive relief which enjoined the State Board from certifying the general election ballot with Ms. Ademiluyi's name listed as a candidate. *Ademiluyi v. Egbuonu*, 461 Md. 455 (2018). In that order, we indicated that an opinion detailing the reasoning behind our affirmance of the circuit court's decision would follow. In explanation of that *per curiam* order, we conclude that the Libertarian Party's nomination of Ms. Ademiluyi did not comport with the requirements of § 5-701 of the Election Law Article ("EL") and that the circuit court's grant of preliminary injunction is sufficiently supported by the appropriate factors.

We now give our reasons for the September 6, 2018 order. The election of judges in Maryland has been the subject of a lengthy and long-standing debate—initially emerging from constitutional reform of the mid-19th century. It is useful to begin our analysis with a historical review of the partisan underpinnings of this imperfect hybrid of an electoral process.

## BACKGROUND

*The History of Judicial Elections in Maryland*

For the first seventy-five years of Maryland's history after the adoption of the Constitution of 1776, judges were appointed by the Governor and confirmed but were not required to run in contested elections. Maryland's first constitution provided for the Governor to appoint all judges with the advice and consent of the Governor's Council. Md. Const. of 1776 § 48 (1776). The Governor's Council, under the Constitution of 1776,

consisted of five members chosen by vote of the State Senate and House of Delegates. The Governor's Council played an advisory role and generally provided the Governor with advice and assisted in his appointments, as provided for elsewhere in the Constitution. Md. Const. of 1776 § 26 (1776).[5]

In 1836, the Governor's Council was abolished by constitutional amendment and full executive power was vested in the Governor. 1836 Md. Laws ch. 197 § 13. Instead of confirmation by the Governor's Council, the Governor made judicial appointments with the advice and consent of the Senate. 1836 Md. Laws ch. 197 § 14.

Constitutional reform of the mid-19th century modified the method of selection of judicial candidates by introducing contested judicial elections similar to our contemporary system. During the Constitutional Reform Convention of 1850 ("1850 Convention"), a fierce debate emerged concerning the method of selecting judges. The debate primarily consisted of two different methodologies: (i) popular election; and (ii) appointment by the Governor for an indefinite term, with the Governor holding the power to impeach and remove an appointed judge only upon bad behavior.[6] Debates and Proceedings of the Maryland Constitutional Reform Convention to Revise the State Constitution, Vol. II (1851) ("1850 Debates and Proceedings"). The popular election system carried support

---

[5] *See also* Maryland State Archives, *Archives of Maryland vol. 73: Kilty's Land-Holder's Assistant, and Land-Office Guide*, Preface 5 (1808) *available at:* http://aomol.msa.maryland.gov/000001/000073/html/index.html.

[6] There was a subsidiary debate among the members of the Constitutional Reform Convention of 1850 concerning whether judges should be appointed for life or subject to a definite term. Under the proposal of the Whig Party, judges would have a lifetime appointment. 1850 Debates at 529–32.

from the Democrats while an appointed judiciary appealed to members of the Whig Party. *Id.*

As evidenced by the debates, both the Whigs and Democrats were concerned about partisan influence on judicial offices stemming from whichever selection process was adopted. *Id.* at 497–99. The Democrats expressed concern that appointment by the Governor would transform judicial offices into partisan offices. *Id.* at 457–62. Similarly, the Whigs expressed concern that, without indefinite terms, incoming Governors would have the power to dismiss incumbent judges throughout the State and appoint newly partisan judges. *Id.* at 470–73, 476.

In addition to debates concerning the method of selection, a secondary issue emerged concerning temporal aspects of judicial elections. *Id.* at 490–501. Primarily, some members of the 1850 Convention argued that elections for judicial offices and other courthouse officials including State's Attorneys and Clerks of the Court, should be held the year following elections for other public officers. *Id.* Those involved believed that temporal distance between elections for judicial offices and other public offices, such as the Governor and State Legislature, would distance judicial elections from the partisan undercurrent of elections for these public offices. *Id.* at 537–44.

Ezekiel F. Chambers, a member of the 1850 Convention and Judge of this Court, summarized the general concerns over the politicization of judicial elections in his sweeping remarks before the 1850 Convention:[7]

> I am aware, Sir, that it is said the people are competent to elect other officers; and if so, why not to elect judges?
>
> * * *
>
> Now this is the relation in which the judge stands to the people. The judge is supposed to *know* the law; the people are known not to know it. He is to exercise *his* judgement, not *theirs* – to express his opinions, not theirs. Political officers are usually elected for a very short term, and in reference to particular, distinct, well understood questions. They have a certain line of duty, and everybody understands what it is. But it is not so in the case of the judge; his position is perfectly the reverse, in all these particulars. Above all, it differs in one other most important respect. In a political officer, you look for a politician; you expect him to act for those who elected him, and if he never were a politician before, he will surely become such, by serving a while as the representative of the people. Just the reverse it is with the judge. He must not act the politician; he must not know one party from another in the discharge of his duties; and if he had been ever so ardent a politician before, he is sure to cease to be such, in a very short time after he is placed upon the bench.

1850 Debates and Proceedings at 482.

---

[7] Judge Chambers, of Kent County, was a judge on this Court from 1834 to 1851. In addition to his role on this Court, Mr. Chambers served as a member of the Maryland Senate from 1821 to 1825, of the United States Senate from 1826 to 1834, and the Chief Judge of the second judicial circuit of Maryland. Archives of Maryland, Ezekial Forman Chambers, MSA SC 3520-1989. At that time, the Chief Judge of a judicial circuit had dual roles—serving as a trial court judge of the circuit but also, by virtue of being the circuit's Chief Judge, as an appellate judge of the Court of Appeals.

Other members of the 1850 Convention including William A. Spencer echoed Mr. Chambers' concerns over the selection of judges through popular election:[8]

> It is my apprehension that by giving the election of the judges to the people, the independence of the bar will be greatly affected. I wish it to be distinctly understood, that I have not the slightest fear of the integrity of the people but my apprehension is that that integrity and confidence will be abused.

*Id.* at 499.

However, the 1850 Convention was not unified behind an appointed judiciary and a substantial number of its members supported the election of judicial officers. This is evident from Charles J.M. Gwinn's comments on the debate:[9]

> The gentleman from Anne Arundel [Judge Thomas Beal Dorsey], has drawn a strongly marked picture of the evils attending upon an election of the judges. It has not occurred to him, apparently, that all his arguments apply with equal force to every elective office. If a disposition to obtain popular support and applause, can induce a judge to depart from the line of his public duty, with equal reason may we apprehend that the same evil would ensue upon the method which obtains at present in the selection of our Governors, and members of the Legislature, and of all others who are entrusted with political power.[10]

---

[8] Mr. Spencer, of Queen Anne's County, was a member of the Maryland House of Delegates from 1838 to 1839, a member of the 1850 Constitutional Convention, and Clerk of this Court from 1862 to 1863. Archives of Maryland, William A. Spencer, MSA SC 3520-13841.

[9] Mr. Gwinn, of Baltimore City, was a member of the Maryland House of Delegates in 1849, a member of the 1850 Convention, the first State's Attorney of Baltimore elected under the 1851 Constitution from 1857 to 1861, and Attorney General of Maryland from 1875 to 1883. Archives of Maryland, Charles J. M. Gwinn, MSA SC 3520-1507.

[10] Chief Judge Dorsey, of Anne Arundel County, was a member of the Maryland House of Delegates in 1807, the United States Attorney for Maryland from 1811 to 1812, the Attorney General of Maryland from 1822 to 1824, an Associate Judge on this Court from 1824 to 1848, and Chief Judge of this Court from 1848 to 1851. Archives of Maryland, Thomas Beale Dorsey, MSA SC 3520-1498.

*Id.* at 497.

After a lengthy debate, a broad restructuring of the Maryland judiciary was authorized upon the ratification of the Constitution of 1851. The trial courts were reorganized into eight judicial circuits.[11] Initially, each circuit except the fifth, i.e. Baltimore City, was limited to one judge who was subject to election on a partisan ballot. Md. Const. of 1851 art. IV, § 8 (1851). The Judiciary Article of the new Constitution provided that, upon a vacancy in any judgeship, the Governor shall appoint a replacement with the advice and consent of the Senate. The appointed judge shall hold the office until the following general election for delegates. Md. Const. of 1851 art. IV, § 25 (1851). To retain office, the appointed judge became a candidate in partisan elections with the potential that challengers would also file to run in the election. The successful candidate in the election, once the results were certified, would receive a commission for a term of ten years.[12]

---

[11] Under the 1851 Constitution, the eight judicial circuits consisted of the following counties: (1) St. Mary's, Charles, Prince George's, and Anne Arundel Counties, (2) Howard, Calvert, and Montgomery Counties; (3) Frederick and Carroll Counties; (4) Washington and Allegany Counties; (5) Baltimore City; (6) Baltimore, Harford, and Cecil Counties; (7) Kent, Queen Anne's, Talbot, and Caroline Counties; (8) Dorchester, Somerset, and Worcester Counties. Md. Const. of 1851 art. IV, § 19 (1851).

[12] The "general election for delegates" essentially means the election year in which the members of the Maryland House of Delegates are elected. In the mid-19th century, elections were held every year and thus candidates for judicial offices would run in the same cycle as Delegates. *See* 1850 Debates and Proceedings at 204. The introduction of quadrennial elections through the "Fewer Elections Amendment[,]" i.e. Article XVII of the Maryland Constitution, did not occur until its adoption in 1922. *Cty. Comm'rs for*

When the Constitution of 1864 was adopted and ratified, the Judicial Article and the methods of judicial candidate selection saw little substantive change to the preceding provisions. The eight judicial circuits were expanded to thirteen circuits. In addition, the terms of circuit court judges were increased from ten to fifteen years.[13] *See* Md. Const. of 1864 art. IV, §§ 3, 5 (1864). The Constitution of 1864 was the most short-lived Constitution in Maryland's history and was replaced only three years later in 1867 with substantially the same provisions for circuit court judges. *See* Md. Const. of 1867 art. IV, §§ 3, 5 (1867).

The State's current Constitution is the Constitution of 1867, as amended, and thus these 19th century constitutional underpinnings relating to the selection of circuit court judges are relatively unchanged. *See* Md. Const. art. IV, §§ 3, 5. First, circuit court judges are elected at general elections for a term of fifteen years. Md. Const. art. IV, § 3. Upon a vacancy in a judicial office, the Governor is authorized to appoint a judge who shall hold the office until either the first biennial general election for representatives in Congress following the expiration of his or her predecessor's term. Md. Const. art. IV, § 5. In

---

*Montgomery Cty. v. Supervisors of Elections of Montgomery Cty.*, 192 Md. 196, 204 (1948).

[13] Under the 1867 Constitution, the prior eight judicial circuits were expanded to thirteen. Md. Const. of 1867 art. IV, § 19 (1867). The judicial circuits were distributed as follows: (1) St. Mary's and Charles Counties; (2) Anne Arundel and Calvert Counties; (3) Prince George's and Montgomery Counties; (4) Frederick County; (5) Washington County; (6) Allegany County; (7) Carroll and Howard Counties; (8) Baltimore County; (9) Harford and Cecil Counties; (10) Kent and Queen Anne's Counties; (11) Talbot and Caroline Counties; (12) Dorchester, Somerset, and Worcester Counties; and (13) Baltimore City. *Id.*

situations where the vacancy is brought about by means other than the expiration of a predecessor judge's term, the appointed judge participates in the general election occurring after one year after the opening of such a vacancy. Md. Const. art. IV, § 5.

Circuit court judges are the only judges in Maryland that are first appointed by the Governor and then must participate and win a subsequent election in which challengers can file to run against them.[14] *See* Md. Const. art. IV, § 3 (excepting District Court and appellate judges from participating in contested elections); s*ee also* Md. Const. art. IV. § 5A (providing that, after appointment by the Governor, appellate judges must participate in retention elections); Md. Const. art. IV, § 41D (indicating that District Court judges are appointed by the Governor and confirmed by the Senate and are not required to participate in judicial elections). Maryland's present Constitution also mandates qualifications that all prospective judicial candidates must attain.[15]

*Judicial Nominating Conventions and Primary Elections*

Pursuant to the Constitution of Maryland, the General Assembly has the responsibility of regulating elections. *Lamone v. Capozzi*, 396 Md. 53, 60–61 (2006); s*ee*

---

[14] Judges of the Orphan's Court are elected in purely partisan contests in both the primary and general elections, but in contrast to circuit court elections, the Governor plays no role within this process. *See* Md. Const. art. IV. § 40.

[15] Constitutionally, judicial candidates must meet the following qualifications: (i) Maryland citizenship; (ii) qualified voters; (iii) residents of the State for at least five years; (iv) residents of the county, city, district, or judicial circuit, within which they seek election, for at least six months preceding election or appointment; (v) at least thirty-years old; (vi) admitted to practice law within the State; and (vii) be "distinguished for integrity, wisdom and sound legal knowledge." Md. Const. art. IV, § 2.

*also* Md. Const. art. I, § 3; Md. Const. art. III, § 49. Accordingly, throughout the history of the State Constitution and its various amendments, the General Assembly has supplemented these constitutional provisions by enacting and amending the statutory law governing elections, primarily former Article 33 of the Maryland Code and the present-day Election Law Article.

Prior to the adoption of primary elections in the early 20th century, political parties nominated candidates for circuit court judge by party conventions. By the late 19th century, the two principal political parties were the Democratic and Republican parties. These parties would nominate their candidates through separate statewide and county nominating conventions. *See* 1896 Md. Laws ch. 202 § 36–39. For judicial elections, if a circuit was composed of only one county, the candidate for circuit court judge was selected at the county nominating convention held by the Democratic, Republican, or other political party. If a circuit was composed of more than one county, then each party held a special judicial nominating convention for the circuit at which representatives from each county would vote to select the party's candidate for circuit court judge. The party nominating convention allowed parties to nominate a particular candidate to run for judicial office whose name was then placed on the general election ballot. *Id.; see also Jackson v. Norris*, 173 Md. 579, 586 (1937); 1890 Md. Laws ch. 538.

Throughout this period, ballots were printed by the political parties and distributed to voters to be placed in the ballot box at their precinct polling location. Unlike ballots today that display the names of all candidates for each office, these ballots only contained the names of the political party's candidates. Thus, a voter could vote the entire slate on

13

the printed party ballot,[16] by dropping it in the ballot box.  Alternatively, they could scratch through and mark up the printed ballot with different names if they were departing from the party's slate or they could arrive at the polls with their own handwritten ballot.  1805 Md. Laws ch. XCV.[17]  The partisan nature of these circuit court judicial elections is clear on its face:  (1) candidates for circuit court judge were selected by each party at a county nominating convention or at a multi-county judicial nominating convention; and (2) the judicial candidate's name was printed on the party's printed partisan ballot that was

---

[16] This was the general practice throughout Maryland and the United States as a whole, prior to the introduction of public ballots.  *See* Will Evans, Boston Athenæum Digital Collections, *Nineteenth-Century Political Ballots*, *available at: https://cdm.bostonathenaeum.org/digital/collection/p16057coll29*; s*ee also* Arthur Crosby Ludington, *American Ballot Laws 1888–1910*, 31–33 (Univ. of the State of N.Y.) (1911).

[17] For example, this method of balloting and the process for administration of elections is authorized as follows:

> [T]he elections aforesaid respectively shall commence at nine o'clock in the morning of the respective days of election, and shall continue without adjournment, and be closed at six o'clock in the evening of the same day, and no ballot shall be taken before the said hour of nine o'clock in the morning, nor after the said hour of six o'clock in the evening, and every vote shall deliver to the judge or judges of the election in the district in which he offers to vote, a ballot, on which shall be written, or printed, the name or names of the person or persons voted for, and the purpose for which the vote is given, plainly designated, and the ballot so delivered in, and received by the judge or judges of the election, shall be deposited in the ballot box till the poll is closed . . . . and if any voter shall offer any more than one ballot, with a fraudulent design, every such person shall forfeit and pay the sum of twenty dollars for every such offence.

1805 Md. Laws ch. XCV § XII.

distributed to voters with encouragement to vote the entire party slate by dropping the ballot, unmarked, into the ballot box.

Three significant changes occurred to the electoral process in the late 19th and early 20th centuries. First, the General Assembly required that official ballots be printed by the county election board. 1890 Md. Laws ch. 538. Second, the General Assembly enacted provisions that the political parties must follow to nominate their candidates to be listed on the official ballot.[18] Third, a system of statewide primary elections was created for the benefit of the principal political parties to allow selection of their nominees for the general election by popular vote.

This system of primary elections more closely resembling the modern iteration appeared in the early 20th century. In 1904, the General Assembly enacted a provision within the Public Local Laws of Allegany County, which provided that the two foremost political parties within the County would select candidates for public offices to participate in the general election by primary election. *Kenneweg v. Cty. Comm'rs of Allegany Cty.*, 102 Md. 119, 120 (1905); s*ee also* 1904 Md. Laws ch. 508 § 105. Individually, other counties sought legislation to hold county-wide primaries until 1910 when the first statewide primary election system was enacted. *See* Md. Laws 1910 ch. 741; *Foxwell v. Beck*, 117 Md. 1 (1911). With the advent of county and statewide primaries, the selection of circuit court judges by the principal parties was accomplished through contested partisan

---

[18] The General Assembly accomplished these two revisions in 1896 within the legislation that repealed the existing election code and reenacted a new election code, titled Article 33. 1896 Md. Laws ch. 202.

primaries. Non-principal parties selected their judicial candidates through the traditional party nominating convention or primary meetings. 1896 Md. Laws ch. 202 § 36–39.

*Governor O'Conor and the Bond Commission*

A major impetus to reform judicial elections occurred during the administration of Governor Herbert O'Conor. An attorney and former Attorney General, O'Conor was elected Governor in 1938 and reform of the judiciary and the elimination of partisan elections of judges was a priority of his legislative platform. In his first inaugural address on January 11, 1939, he commented,

> I should now like to make known my views with respect to the Judiciary. No single fact has been impressed upon me more forcibly than the necessity of having the judiciary function without outside interference. I am sure that we agree that a State is fortunate whose courts are administered by high-minded judges, incorruptible, learned, and experienced. My policy shall be always to assist in securing the very best judges and in having them function unhampered and uninfluenced in the discharge of their important duties.
>
> Maryland is justly proud of its higher courts and illustrious line of judges who have brought distinction and honor to Maryland. It seems timely, however, to point out that the methods might be devised to avoid the possibility of future election of judges being thrown into political contests. The administration will support well considered plans to prevent such an occurrence.

Herbert O'Conor, *State Papers and Addresses of Governor Herbert R. O'Conor* (1947).

Governor O'Conor initiated a broad package of judicial election reform including revamping this Court as a full-time appellate bench.[19] However, in the legislative

---

[19] At the time, the Court of Appeals was comprised of the eight chief judges of their individual judicial circuits. *See* Final Report of the Bond Commission; *O'Conor Backs Bond Court Plan: Calls it 'Final Effort to Strengthen Judiciary'*, The Sun (1837–1993); Nov. 3, 1944; ProQuest Historical Newspapers: The Balt. Sun.

atmosphere created by Governor O'Conor of insulating judicial elections from partisan influence by eliminating judicial elections, Delegate Bernard S. Melnicove offered an alternative approach by introducing legislation in 1941 (House Bill 800) to simply remove party affiliations from the ballot of judicial candidates. *See Prepares Bill to Take Bench from Politics*, Kerney, N.T., *The Sun* (1837–1993); Mar 15, 1941: ProQuest Historical Newspapers: The Balt. Sun. Specifically, the legislation required that the names of judicial candidates be listed in alphabetical order "without any party label or other distinguishing mark or location which might directly or indirectly indicate the party affiliation of any such candidate." 1941 Md. Laws Ch. 703.

Governor O'Conor's legislative proposals to reform the judiciary were controversial and after their initial failure, he formed the Commission on the Judiciary Article of the Constitution of Maryland, widely referred to as the Bond Commission, and appointed Carroll T. Bond, the Chief Judge of this Court, as chairman.[20] The Bond Commission initially intended to pursue the Governor's aim of reforming judicial electoral process with an eye towards eliminating partisan elements.

The Melnicove bill created substantial confusion for the judicial candidates required to run in the 1942 election, because this legislation did not provide any new provisions for the conduct of judicial elections except to remove party affiliation from the ballot. *Id.*

---

[20] Chief Judge Carroll T. Bond was a trial judge on the Supreme Bench of Baltimore City, now the Circuit Court for Baltimore City, from 1911 to 1924, and was Chief Judge of this Court from 1924 to 1943. Archives of Maryland, Carroll T. Bond, MSA SC 3520-1630.

17

Attorney General William C. Walsh was asked to opine on whether candidates were able to file in both the Democratic and Republican primary elections, which was not provided for in the bill that passed the General Assembly.[21] *Ruling Asked on Judiciary: Question on Judges Filing as Candidates of Both Parties Involved*, *The Sun* (1837–1993); May 9, 1942; ProQuest Historical Newspapers: The Balt. Sun. The Attorney General summarized his opinion that "a Democratic Judge may file as a candidate for the Republican nomination in a primary, and that a Republican Judge may file for the Democratic nomination in a primary, and the only remaining question is whether a Judge may file in both primaries for both nominations." 61 Op. Atty Gen. 126, 128 (1942).

The Attorney General opined that the statute had no prohibition against a candidate filing in the primary election for more than one political party. *Id.* at 130. He based his conclusion, in part on the fact that H.B. 800 removed party affiliations from ballots, and commented "[t]he purpose of the proposal to have the sitting Judges concerning whom you inquire, nominated by both the major political parties in the primary next September, is to eliminate, in so far as possible, any partisanship in the election of the members of the judiciary, and the passage of [1941 Md. Laws ch. 703 (H.B. 800)] is an indication of legislative approval of this purpose." *Id.* at 129.

---

[21] Attorney General Walsh's opinion was in response to a letter from James L. Hennegan, then President of the Board of Supervisors of Elections for Baltimore City. 61 Op. Atty Gen. 126, 128 (1942). Mr. Hennegan specifically requested Mr. Walsh to opine as to whether several incumbent judges, i.e. Carroll T. Bond, George A. Solter, Eugene O'Dunne, and Joseph N. Ulman, could file in both the Democratic and Republican primary elections. *Id.* Based upon this advice, the four judges cross-filed and were successful in their elections.

The Bond Commission proceeded with its work and presented its findings and recommendations that were divided in an interim and a final report. In its interim report, the Bond Commission established the priority of recommending modifications to the structure of the Court of Appeals and appellate judges. Interim Report of the Commission on the Judiciary Article of the Constitution of Maryland 6 (1942) ("Interim Report of the Bond Commission"). The Commission recommended that such judges initially be appointed by the Governor and serve a term of at least one year, at which point the appointed judge should stand for election in the following general election for either State or Federal offices.[22] *Id.* at 4. Additionally, the Commission recommended that judicial candidates should be placed on the ballot without any reference to the candidate's party

---

[22] At the time, judges were appointed to fill vacancies until the Gubernatorial Election subsequent to their appointment, a quadrennial basis, with judges serving pre-election terms ranging from "a few days to almost four years" which the Commission felt was "too long if the judges are to hold office ultimately by election." Interim Report of the Bond Commission at 5; Final Report of the Bond Commission at 8. In its interim report, the Commission recommended that the appointed judges stand for election at the following election for members of the General Assembly, which occurred every two years—a biennial basis. *Id.*

affiliation. [23]   *Id.*  In the final report, the Bond Commission skirted Governor O'Conor's

agenda of eliminating judicial elections by reporting:[24]

> The members of the commission have not overlooked the advantages of appointment alone as a method of selecting judges: many, perhaps a majority, thought that in Maryland, as in some other states and in the federal jurisdiction, that method might procure the best judges in the long run, but they also felt that the people of the state would prefer to have the ultimate power of election, and the effort has been made to retain the opportunity for this.

Report of the Commission on the Judiciary Article of the Constitution of Maryland,

October 21, 1942.

In 1943, as a result of the Bond Commission's deliberations and recommendations,

the General Assembly enacted what is commonly referred to as the Bond Amendment,

which was ratified by the electorate in November 1946.  1943 Md. Laws ch. 772; *Reed v.*

*McKeldin*, 207 Md. 553, 558–59 (1955).  Among other things, the amendment modified

Article IV, section five of the Constitution of Maryland to provide the following:

> Upon every occurrence or recurrence of a vacancy through death, resignation, removal, disqualification by reason of age or otherwise, or expiration of the term of fifteen years of any judge, or creation of the office of any judge, or in any other way, the Governor shall appoint a person duly

---

[23] The Bond Commission fully endorsed the concept in the statute that had been introduced by Delegate Melnicove through H.B. 800 and they advocated that this provision be retained, despite any other modifications to the electoral process recommended by the Commission.  1941 Md. Laws ch. 703; s*ee also* Interim Report of the Bond Commission at 4.  As evidence of this, the Bond Commission recommended that this provision be incorporated into art. IV, § 5 of the Maryland Constitution.  However, this provision was cut from the final version of the Bond Amendment but remained part of the statutory election code.  *See* Bond Commission's Draft Bill of Proposed Amendments at 56–57.

[24] The elimination of contested elections for appellate judges was not adopted at that time but was accomplished by constitutional amendment in 1976.  *See* 1976 Md. Laws ch. 542.

qualified to fill said office, who shall hold the same until the election and qualification of his successor. His successor shall be elected at the first biennial general election for Representatives in Congress after the expiration of the term of fifteen years (if the vacancy occurred in that way) or the first such general election after one year after the occurrence of the vacancy in any other way than through expiration of such term. Except in case of reappointment of a judge upon expiration of his term of fifteen years, no person shall be appointed who will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time when his successor would have been elected.

1943 Md. Laws ch. 772.[25]

Over seventy years later, the reforms of the mid-20th century are the core features of circuit court judge elections today. The Melnicove bill provided a façade of nonpartisanship in the layout of the judicial ballot. The opinion by Attorney General Walsh to allow cross-filing in the primary elections of the two principal parties provided a tenor of bipartisanship. But the inherent partisanship discussed by this Court in *Suessmann* remains because the selection of circuit court judicial candidates is vested in the exclusive domain of the two principal parties, i.e. the Democratic and Republican parties of Maryland.

*Contemporary Statutory Regulation of Elections, this Court's Decisions in Green Party, Suessmann, and the General Assembly's Response*

The overarching purpose of the Election Law Article is to ensure fairness within the elective process and to create an even playing field for candidates, voters, political parties, and others involved with the conduct of elections. *See* EL § 1-201. The net effect of the

---

[25] Article IV § 5 was further amended in 1945 which made little substantive change. 1945 Md. Laws ch. 703. This amendment was ratified by the electorate in November of 1944.

reform efforts in the mid-20th century created a system of judicial elections that could—at best—be characterized as an imperfect hybrid. As shown by the short history described above, the issue of judicial independence versus partisan elections has been hotly debated since the 1851 Constitution. Today, it is a perennial issue before the General Assembly with various bills introduced to eliminate the election of circuit court judges or to modify the current judicial electoral process.

Two recent cases before this Court challenged this electoral process for circuit court judges. In *Maryland Green Party v. Maryland Bd. of Elections* ("*Green Party*"), this Court was asked to assess the constitutionality of certain provisions of the Election Law Article, as applied to non-principal parties. 377 Md. 127, 155–56 (2003). Prior to this case, candidates belonging to non-principal political parties and those unaffiliated with any political party were required to achieve nomination through petition signed by a certain number of citizens. 1896 Md. Laws ch. 202; *see also Iverson v. Jones, Sec'y of State*, 171 Md. 649, 864. In challenging this provision, the Green Party of Maryland averred that the statutory requirement that mandated a petition process to nominate candidates, in conjunction with the initial petition requirement to form a new political party, was unconstitutional. *Id.* at 153. Ultimately, the Court agreed and held that the double petitioning mandate in the statute violated the equal protection provision of Article 24 of Maryland's Declaration of Rights. *Id.* at 156–157.

The following year, this Court reviewed a challenge by unaffiliated voters who claimed that their exclusion from voting for circuit court judges in Maryland's primary elections was unconstitutional. *Suessmann*, 383 Md. at 721–22. Specifically, the Court

22

was asked to enjoin the certification of the election results in Anne Arundel County and St. Mary's County circuit court elections because the voters of non-principal political parties and those unaffiliated with a political party were excluded from participating in primary election on March 2, 2004. *Id.* at 704–05. We concluded that Maryland's system of judicial elections as designed by the General Assembly, through utilization of party primaries, is constitutional even though the electoral process is inherently partisan.

*Suessmann* highlights an imperfection within our judicial electoral process. As a consequence of conducting primary elections through the two principal parties, a large number of registered voters are excluded. For example, approximately twenty percent of Maryland's registered voters were not registered with a principal party and therefore were ineligible to vote in circuit court judge elections during the 2018 primary.[26] Ultimately, the Court held that this procedure did not violate the equal protection provisions of the Maryland or Federal Constitutions. *Id.* at 733.

As a result of *Suessmann* and *Green Party*, the General Assembly enacted legislation aimed at remedying these deficiencies within our judicial electoral system. *See*

---

[26] In 2018, there were a total of 4,018,891 registered voters within the State. Maryland State Board of Elections, *Voter Registration Activity Report*, November 2108. The composition of these voters is as follows: 2,204,933 voters registered as Democrats, 1,023,148 voters registered as Republicans, 9,287 voters registered with the Green Party, 22,338 voters registered with the Libertarian Party, 726,001 voters unaffiliated with any political party, and 33,184 voters registered with other parties. *Id.* In sum, voters affiliating with the Green, Libertarian, other parties, and those unaffiliated with any political party totaled 790,810—nearly twenty percent of the State's electorate.

23

2006 Md. Laws ch. 120 (S.B. 129).[27] Therein, the General Assembly established that non-principal political parties may nominate candidates through their party bylaws and the filing of certificates of nomination with the State Board. *Id.*; EL § 5-701(3).[28] This revised nomination statute allows three avenues for challengers to access the ballot, dependent upon a candidate's party affiliation. First, candidates nominated by a principal political party must be nominated through participation in primary elections. EL §§ 5-701(1), 8-202(a). Candidates of non-principal political parties must be nominated in accordance with that party's constitution or bylaws. EL § 5-701(3). Additionally, as unchanged from earlier electoral procedure, candidates not affiliated with any political party may seek nomination by petition signed by a specific number of registered voters.[29] EL § 5-701(2). The instant appeal concerns these statutory revisions for nomination of candidates by non-principal parties as enacted by the General Assembly in 2006.

---

[27] As referenced *supra* in *Green Party*, this Court held that the "Election Code's two-tiered petition requirement for [non-principal] parties[,]" i.e. requiring non-principal parties to garnish 10,000 signatures to establish the party and requiring its candidate to be nominated through petition signed by a certain number of voters, was violative of the equal protection components of the Maryland Declaration of Rights. 377 Md. at 156–157. In *Suessmann*, this Court entertained a challenge to the Election Code by unaffiliated voters. 383 Md. at 704. The Court concluded that the Election Code's exclusion of unaffiliated voters from primary elections was constitutional. *Id.* at 732–733. As a result, a significant portion of the electorate became disenfranchised.

[28] This is an extraordinary power granted to non-principal political parties. It allows, in this case, parties with less than one percent of the registered voters in the state to nominate judicial candidates directly to the general election and thus to bypass the primary contests. As such, it is a power of nomination to be carefully adhered to and closely guarded.

[29] Prior to 2006, candidates of non-principal political parties were nominated by petition, in a similar fashion. However, in 2006, this Court invalidated that provision. *See supra* at 22–23.

24

On June 18, 2018, Appellant, April T. Ademiluyi filed a certificate of candidacy with the State Board seeking certification of her candidacy for the office of Judge of the Circuit Court for Prince George's County. Along with her certificate of candidacy, was a certificate of nomination or designation from the Libertarian Party of Maryland certifying the party's nomination of Ms. Ademiluyi. Curiously, Ms. Ademiluyi's certificate of candidacy indicates her party affiliation as "judicial" but the certificate of nomination or designation lists her party affiliation as Democrat.

On June 28, 2018, the State Board posted Ms. Ademiluyi's name on its website as a candidate with indication she was a candidate only in the 2018 Gubernatorial General Election. On July 19, 2018, the State Board certified the results of the primary election and posted the list of candidates for the 2018 Gubernatorial General Election on its website. The same day, attorneys for Appellees, of which none are registered members of the Libertarian Party, submitted a MPIA request to the State Board seeking Ms. Ademiluyi's voter registration records and records related to her candidacy for judicial office. On July 24, 2018, Appellees received the documents associated with Ms. Ademiluyi's party affiliation and candidacy from the State Board confirming that she is and had been a registered Democrat.

The following day, on July 25, 2018, Appellees brought action in the Circuit Court for Prince George's County against Ms. Ademiluyi, the State Board, Linda H. Lamone in her capacity as State Administrator of Elections, the Libertarian Party, Robert S. Johnston, III, Chairman of the Libertarian Party, and Robert E. Glaser, Secretary of the Libertarian

25

Party. Appellees filed a petition for writ of mandamus, declaratory judgment, and preliminary and permanent injunctive relief aimed at challenging Ms. Ademiluyi's qualification for judicial nomination as a Libertarian Party nominee.

Within this action, Appellees sought to remove Ms. Ademiluyi from the general election ballot and requested injunctive relief against the Libertarian Party requiring the party to rescind its nomination of Ms. Ademiluyi. Appellees alleged that the Libertarian Party's nomination of Ms. Ademiluyi was invalid, because she is a registered Democrat which they alleged violates the candidate qualification requirements set by the Libertarian Party's Constitution. [30]

On August 2, 2018, the clerk's office of the circuit court issued summons and sent them by regular mail. Appellees' attorney testified that he received the summons on August 6, 2018. In response, Appellees sent summons to a private process server whom served Ms. Ademiluyi, the State Board, Ms. Lamone, and Mr. Glaser on August 8, 2018. Because the State Board had an incorrect address on file for Mr. Johnston, he was not served until August 10, 2018. The case was specially assigned to the Honorable E. Gregory Wells who, at that time, was a Judge of the Circuit Court for Calvert County.[31]

---

[30] Although Ms. Lamone was present at the hearing, she did not make any arguments regarding Ms. Ademiluyi's claims and deferred to the State Board to defend against the charges. Hereafter, Ms. Lamone and the State Board of Elections will be referred to collectively as "the State Board."

[31] In March of 2019, Judge Wells was appointed and confirmed to the Court of Special Appeals of Maryland.

On August 15, 2018, Appellees filed a motion for a temporary restraining order and a preliminary injunction. At a hearing on the same day, the circuit court declined to rule on Appellees' motion and scheduled a tentative hearing for the following week. Two days later, on August 17, Ms. Ademiluyi filed a motion seeking an extension of time and a rescheduling of the preliminary injunction hearing which was scheduled for August 24. In her motion, Ms. Ademiluyi alleged improper notice with respect to Appellees' motion for a preliminary injunction and that she lacked sufficient time to prepare for the hearing. The State Board and Ms. Lamone opposed postponement.

At the August 24 hearing, Ms. Ademiluyi did not appear, and the court declined to rule on her postponement motion. The State Board was the primary party opposing Appellees' claims. Although Ms. Ademiluyi was absent, the State Board opposed entry of a preliminary injunction hearing but took no position on the merits of Appellees' claims. Rather, the State Board argued that Appellees' claims were barred by the statute of limitations, the doctrine of laches, or both. The State Board argued that Appellees failed to act diligently in bringing the action, due to the delay between Ms. Ademiluyi's nomination being posted on the State Board's website on June 28 and Appellees' MPIA request on July 19. Further, the State Board also indicated that this delay left Ms. Ademiluyi with insufficient time to change her party affiliation and therefore correct any deficiencies in her qualifications as a candidate. Although the State Board conceded that modification of the ballot was possible, the State Board argued that any further delay would be prejudicial if it was unable to comply with a final order without disrupting the orderly administration of the election. Additionally, Mr. Johnson attended the hearing for the

27

Libertarian Party but did not oppose Appellees' motion for a preliminary injunction or participate in arguments.

After arguments at the August 24 hearing, the circuit court granted the preliminary injunction. The court rejected arguments by the State Board that Appellees' claims were barred by the statute of limitations or the doctrine of laches, finding that Appellees acted diligently in commencing the action. The circuit court then issued an order which preliminarily enjoined the State Board from certifying the general election ballot with Ms. Ademiluyi listed as a candidate. On August 27, 2018, Ms. Ademiluyi filed a motion seeking recusal of the specially assigned judge alleging a conflict of interest. In addition, Ms. Ademiluyi filed a motion seeking dismissal or, in the alternative, a stay of the injunction pending appeal. The following day, Ms. Ademiluyi filed a notice of appeal pursuant to EL § 12-203(3) which, in certain cases involving issues of election law, permits a direct appeal from the circuit court to this Court within five days of the circuit court's decision.

## STANDARD OF REVIEW

In the present appeal, we must determine whether the circuit court erred by granting preliminary injunctive relief. Generally, when reviewing a grant of preliminary injunction, this Court does not "determine the merits of the parties' arguments." *Ehrlich v. Perez*, 394 Md. 691, 707 (2006) (quoting *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 300 (2004); *Schade*, 401 Md. at 33. Our review is limited to "whether the trial court properly granted the preliminary injunction." *Ehrlich*, 394 Md. at 707. This court has acknowledged on several occasions that a grant of preliminary injunctive relief rests in the discretion of the

28

circuit court judge. *Eastside Vend Distribs., Inc. v. Pepsi Bottling Grp., Inc.*, 396 Md. 219, 240 (2006); s*ee also State Dep't of Health & Mental Hygiene v. Balt. Cty.*, 281 Md. 548, 553 (1977).

When considering whether the affirmative defense of laches has been established this Court is faced with both questions of fact and law. *Liddy v. Lamone*, 398 Md. 233, 245 (2007). This Court has previously indicated that "[w]hether the elements of laches have been established is [a question of] fact . . . while . . . whether in view of the established facts, laches should be invoked, is a question of law." *Id.* at 245–46. Therefore, we review the circuit court's finding with regards to the elements of laches under the abuse of discretion standard and we review the invocation of laches de novo. *Id.*

## DISCUSSION

### A.    The Circuit Court's Grant of Preliminary Injunction

In determining whether a circuit court abused its discretion in granting preliminary injunctive relief this Court considers the following factors:

> (1) the likelihood that the plaintiff will succeed on the merits; (2) the 'balance of convenience' determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest.

*Eastside Vend Distribs., Inc.*, 396 Md. at 240 (quoting *Dep't of Transp. v. Armacost,* 299 Md. 392, 404–05 (1984)); s*ee also State Dep't of Health & Mental Hygiene*, 281 Md. at 554. This Court has previously noted that the first and third factors are generally considered to be the most significant. *Eastside Vend Distribs., Inc.*, 396 Md. at 240–41. Additionally, the above factors are conjunctive, with the burden of establishing all of the

29

factors falling upon the moving party. *Schade*, 401 Md. at 36 ("failure to prove the existence of even one of the four factors will preclude the grant of preliminary injunction relief." (quoting *Ehrlich*, 394 Md. at 708). We have indicated that, in terms of the first factor, a litigant must prove that there is a "real probability of prevailing on the merits, not merely a remote possibility of doing so." *Id.* at 36 (quoting *Ehrlich*, 394 Md. at 708).

In this appeal, the second through fourth factors will be reviewed under the more deferential abuse of discretion standard. *Ehrlich*, 394 Md. at 708. Whereas, the factor involving the likelihood of success on the merits is a question of law, which we will review under the de novo standard. *Id.* ("[T]he Circuit Court's determination of the likelihood of success on the merits is a question of law."). The de novo standard applies to the first factor, because it involves interpretation of certain sections of the Election Law Article, EL § 12-202's period of limitations, and the common law doctrine of laches. Additionally, we review the underlying factual findings of the circuit court in support of its grant of injunctive relief for clear error. *Lamone v. Schlakman*, 451 Md. 468, 479 (2017) (citing *Toms v. Calvary Assembly of God, Inc.*, 446 Md. 543, 551 (2016)).

We must now determine whether the circuit court erred in finding that Appellees' claim would likely be successful on the merits. EL § 12-202 provides statutory standing to voters, in certain instances, to challenge aspects of elections including procedure and the results. *See Suessmann*, 383 Md. at 713. Previously, this Court has referred to EL § 12-202 as "the mechanism for challenging the qualifications of a candidate seeking election." *Ademiluyi v. Maryland State Bd. Of Elections*, 458 Md. 1, 30 (2018) (quoting *Schlakman*, 451 Md. at 482). As the claim was brought pursuant to EL § 12-202, we must examine the

30

statute to determine whether Appellees' claims are meritorious.  EL § 12-202 provides the following:

> (a) If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:
>> (1) is inconsistent with this article or other law applicable to the elections process; and
>> (2) may change or has changed the outcome of the election.
>
> Place and time of filing
> (b) A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:
>> (1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or
>> (2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified.

EL § 12-202.

Accordingly, we must determine whether Ms. Ademiluyi's nomination constitutes an "act or omission . . . inconsistent with [EL] or other law applicable to the elections process."  *Id.*  Appellees aver that the Libertarian Party's nomination of Ms. Ademiluyi was violative of EL § 5-701, which provides that candidates of non-principal political parties must be nominated in accordance with that party's constitution or bylaws.  Further, Appellees' contend that Ms. Ademiluyi's status as a registered Democrat ran afoul of this provision, because the Libertarian Party of Maryland's Constitution requires that its candidates for public office be registered members of the Party.  In contrast, Ms. Ademiluyi argues that EL § 5-203(b)(1) exempts candidates for judicial office from the requirement that they be a registered voter affiliated with the particular party of which he or she secured

31

the nomination. If so, Ms. Ademiluyi's party affiliation is inconsequential and her nomination does not constitute an act or omission inconsistent with the Election Law Article under EL § 12-202(a).

As previously mentioned, EL § 5-203(a)(2) provides that only candidates that are registered voters affiliated with a particular political party may become candidates for that party; EL § 5-203(b)(1) provides that the provisions regarding party affiliation from subsection (a) do not apply to candidates for judicial offices. The argument follows that EL § 5-203(b)(1)'s exception for judicial offices should control in this case, and Ms. Ademiluyi's party affiliation should not affect her candidacy. However, this overlooks the type of political party Ms. Ademiluyi secured the nomination of, the method through which she was nominated, and EL § 5-701(3) altogether. In enacting EL § 5-701(3), the General Assembly has clearly decided to defer certain limited spheres of electoral governance to non-principal political parties—including the qualifications and methods of nominations of a party's candidates.

If a candidate is a member of a principal party, currently the Democratic and Republican parties, they must be nominated through a primary election. If a candidate is not a member of a principal party, then the party affiliation of a particular candidate controls the method through which that candidate may be nominated. EL § 5-702 (indicating that principal political party candidates must nominate candidates through primary elections); EL § 5-703(b) (indicating that candidates not affiliated with any political party must be nominated by petition); EL § 5-703.1 (indicating that members of non-principal political parties must be nominated by that party through a certificate of

32

nomination.)  In the instant case, Ms. Ademiluyi falls within the group governed EL § 5-702 as a registered Democrat.  She instead wishes to be governed by EL § 5-703.1 and be nominated by the Libertarian party through a certificate of nomination.

Previously, potential candidates of non-principal political parties were required to be nominated by petition.  The ability of candidates of non-principal political parties to be nominated through designation in accordance with the party's constitution was established by legislation passed in 2006 by the General Assembly as a legislative response to this Court's decision in *Green Party*, 377 Md. 127 (2003); s*ee supra* at 22–23; 2006 Md. Laws ch. 120 (S.B. 129).  S.B. 129 introduced present day EL § 5-701(3), which provides that political parties that do not nominate by primary elections (e.g. non-principal political parties), must nominate candidates for public offices in accordance with the party's constitution or bylaws.  2006 Md. Laws ch. 120 (S.B. 129); EL § 5-701(3).  In addition, the Bill modified EL § 4-102, to provide that, upon the formation of a new political party—if that political party is not required to nominate candidates for public office by primary election—its candidates shall be nominated in accordance with that party's constitution and bylaws previously submitted to the State Board.  2006 Md. Laws ch. 120 (S.B. 129); EL § 4-102(f).  Moreover, the Bill amended the provision regarding nomination by petition to provide that candidates not affiliated with any particular party must be nominated by petition signed by a certain number of voters.   2006 Md. Laws ch. 120 (S.B. 129); EL § 5-701(2).

Together, EL §§ 4-102 and 5-701 make clear that party constitutions or bylaws control the method through which a non-principal political party may nominate candidates

33

for office—judicial or otherwise. Similarly, the enactment of these two statutes in a single emergency bill clearly evinces the General Assembly's decision, in situations involving the nomination of candidates for office by non-principal political parties, to defer to non-principal parties these specific aspects of electoral regulation—by delegating this responsibility to such parties through their constitutions or bylaws.

This conclusion is further supported by earlier decisions of this Court. The *Suessmann* Court remarked, "primary elections are not wholly creatures of the State Government, for the State must share the governance of such elections with the political party from which the primaries are born." 383 Md. at 708 (citing *California Democratic Party v. Jones*, 530 U.S. 567, 572–73 (2000)). In the limited sphere of candidate qualifications and the nomination procedures of non-principal political parties, this principle still holds true. The General Assembly has clearly left some limited aspects of electoral governance to non-principal political parties themselves by deferring to the constitutions or bylaws of non-principal political parties to establish controlling provisions. Therefore, EL § 5-203(b)(1) does not control in the case *sub judice*; instead EL § 5-701(3) controls, which defers to the constitutions or bylaws of non-principal political parties to determine the necessary qualifications and nomination procedure.

In summary, after the General Assembly passed legislation in 2006, the imperfect hybrid statutory scheme is: (i) judicial candidates of principal political parties must run in primary elections and those candidates' names are on the ballot without any designation of party affiliation; (ii) judicial candidates participating in the primary elections are able to cross-file in either primary election; (iii) judicial candidates that decline to affiliate with a

34

political party can also participate in general elections through securing nomination by petition; and (iv) judicial candidates of non-principal political parties may be nominated by party convention in accordance with that party's constitution or bylaws—such candidates do not participate in primary elections and enter straight into the general election.

Based on this enactment by the General Assembly, it is clear that the legislature intended to create a path for non-principal political parties to nominate a candidate for circuit court judge whose party affiliation was aligned with that non-principal party. It is equally clear that it was not the intent of the General Assembly to permit a voter registered as a member of a principal political party to circumvent the primary election in its entirety and move directly to the general election solely by using a non-principal political party, i.e. the Libertarian Party, as a loophole to secure nomination and obtain ballot access. Indeed, such an interpretation contravenes the underlying purpose of the Election Law Article—ensuring fairness to both members of the electorate and candidates alike. *See* EL § 1-201.

In the instant appeal, Ms. Ademiluyi was nominated by the Libertarian Party, pursuant to EL 5-703.1.[32] As set forth above, at that time, the Libertarian Party was not a

---

[32] We note that currently the only non-principal political party recognized in Maryland is the Blood and Roses Party. On December 31, 2018, the Libertarian and Green parties lost their status as recognized political parties within Maryland. *See* EL § 4-103(a)–(c) (indicating that, to remain a recognized political party, the party's candidate for the highest office sought must obtain at least one percent of the total number of votes for that office; otherwise, the party "loses its status as a political party"); Lillian Reed, *Green and*

35

principal political party and therefore did not nominate by party primary; the Party was required to nominate candidates for office in accordance with its constitution or bylaws—candidates that would thus move directly onto the general election ballot. Accordingly, if the Libertarian Party violated this provision by nominating a candidate in a manner inconsistent with its Constitution or Bylaws, it would constitute an act or omission inconsistent with both EL § 5-701(3) and potentially "other law applicable to the elections process." EL § 12-202(a)(1).

Thus, we must turn to the pertinent portions of the Libertarian Party's Constitution and supporting documents to ascertain whether the Libertarian Party's nomination of Ms. Ademiluyi was inconsistent with the Libertarian Party's constitution or bylaws, thus inconsistent with EL § 5-701(3). Regarding nominating candidates for public office, the Constitution of the Libertarian Party of Maryland provides the following:

> Section 1. Qualifications of Nominees: All persons who seek the nomination of the Party must first meet the legal requirements for age, residency, and registration as provided by the laws of the State of Maryland for the offices they seek before applying for the nomination of the Party. At the time of filing, and continuously through the date of the corresponding General Election, all candidates of the Maryland Libertarian Party to public office must be registered Libertarian as defined in the qualification for Central Committee membership stated in Article IV, Section 2. Should any candidate fail to meet this qualification after nomination and if the state has already been notified of that nomination, the Chairman and Secretary are directed to notify the State Board of Elections that the Party's nomination is rescinded.

---

*Libertarian Parties Are Technically no Longer Recognized in Maryland. Here's Why.*, Balt. Sun, Mar. 20, 2019.

In addition, the qualification for Central Committee Membership in Article IV, Section 2 of the Libertarian Party of Maryland's Constitution further defines a registered Libertarian stating, "the member certifies agreement with the principle set forth in Article II; the member is registered as a Libertarian, unless registration as a Libertarian is not permitted; and is not currently registered as affiliated with any other political party."

Clearly, the Libertarian Party's nomination of Ms. Ademiluyi was contrary to the Party's Constitution, because she was a registered Democrat at all relevant times throughout the nomination process. Therefore, the Libertarian Party's nomination of Ms. Ademiluyi constituted an act inconsistent with EL §5-701(3) that satisfies the requirements of EL § 12-202(a)(1). Additionally, there are other statutory aspects which reveal the inconsistency between the Libertarian Party's nomination of Ms. Ademiluyi and the Election Law Article. The General Assembly has specifically chosen one avenue through which candidates registered with a principal political party may reach the general election, i.e. participation and victory in the primary election. Based on this directive from the General Assembly, it becomes clear that, for Ms. Ademiluyi to obtain a spot on the general election ballot, she must participate in a primary election—based on her status as a registered member of the Democratic party. *See* EL §§ 5-701(1), 8-202(a). Furthermore, Appellees have established that an act or omission inconsistent with the Election Law Article has occurred, and we must now turn our inquiry to whether that act or omission "may change . . . the outcome of the election." EL § 12-202(a)(2).

Previously, this Court has expounded two standards applicable to the statutory language of EL §12-202(a)(2). In instances where the election has already taken place, a

37

plaintiff must demonstrate "by clear and convincing evidence, a *substantial probability* that the outcome would have been different but for the illegality." *Cabrera v. Penate*, 439 Md. 99, 112 (2014) (emphasis in original). Whereas, in situations involving an election which is yet to occur at the time of a judicial challenge, where "our policy against overturning elections is not implicated" a less exacting standard applies. *Id.* Accordingly, in such circumstances, we have held that "there can be no doubt that the inclusion of a candidate on the ballot 'may change' the outcome of an election." *Id.*

The instant controversy concerned Ms. Ademiluyi's potential inclusion on the ballot, even though her qualifications did not comport with the requirements set forth by the Libertarian Party's Constitution or the Election Law Article. Therefore, Ms. Ademiluyi's inclusion on the ballot had the potentiality to change the outcome of the election. This is particularly true considering there would be six judicial offices up for election and Ms. Ademiluyi would constitute the seventh candidate. In such a situation, the potentiality that the additional candidate on the ballot may change the outcome of the election is substantial and evident. Next, we must consider the State Board's arguments regarding the statute of limitations and the doctrine of laches to determine the extent to which these defenses influence Appellees' likelihood of success on the merits.

EL § 12-202 generally controls in situations where there is an issue concerning the timeliness of a registered voter's challenge to a judicial candidate's qualifications. The pertinent temporal provision of EL § 12-202 provides that a registered voter must bring a judicial challenge to a candidate's qualification within ten days after he or she becomes aware of an act or omission inconsistent with the Election Law Article which may change

38

the outcome of the election. EL § 12-202(b)(1). Therefore, our inquiry must focus on the applicable dates surrounding this controversy and the point in time at which Appellees likely became aware of any defects associated with Ms. Ademiluyi's qualifications for judicial office.

Before the circuit court, the State Board argued that Appellees' claims were barred by the statute of limitations and/or the doctrine of laches. However, "statutes of limitations are not controlling measures of equitable relief." *Ross v. State Bd. of Elections*, 387 Md. 649, 668 (2005). In the instant case, Appellees sought an injunction and a writ of mandamus, both of which are equitable remedies. *Falls Rd. Cmty. Ass'n, Inc. v. Balt. Cty.*, 437 Md. 115, 150 (2014) ("an injunction is an equitable remedy[.]"); *Talbot Cty. v. Miles Point Prop., LLC*, 415 Md. 372, 393 (2010) ("a writ of mandamus is an equitable remedy[.]")

In addition to mandamus relief and an injunction, Appellees sought a declaratory judgment before the circuit court. A suit seeking a declaratory judgment is unique, in that it is "neither wholly a suit in equity nor wholly an action at law, [but] may take the on the color of either equity or law, depending upon the issues presented and relief sought." *LaSalle Bank, N.A. v. Reeves*, 173 Md. App. 392, 411 (2007). Furthermore, we have previously interpreted a claim seeking a declaratory judgment to remove a candidate from the ballot as an equitable remedy. *See Schlakman*, 451 Md. at 483-84. Accordingly, the ten-day limitation period of EL § 12-202(b)(1) does not directly apply and will not, in and of itself, bar Appellees' claims for a writ of mandamus, injunction, and declaratory judgment.

Although Appellees' claims are equitable in nature, the equitable nature of the claims does not necessitate jettisoning the limitations period of EL 12-202(b)(1). The ten-day period of EL § 12-202(b)(1) has previously been utilized as a "benchmark" for applying the doctrine of laches to "assess whether the Appellees' delay in filing in the Circuit Court was unreasonable and whether it prejudiced the interests of Appellants." *Schlakman*, 451 Md. at 485 (citing *Liddy*, 398 Md. at 242). Therefore, we must analyze and determine whether Appellees' claims seeking injunction and declaratory judgment are barred by the doctrine of laches, applying the ten-day period of EL § 12-202(b)(1) as a benchmark to assess these claims.

Laches is an affirmative equitable defense that may be raised in a party's answer or invoked sua sponte by a court. Md. Rule 2-323(g); *see Ipes v. Bd. of Fire Comm'rs of Balt.*, 224 Md. 180, 184–86 (1961). Beyond its role as an affirmative defense, "laches is a defense in equity against stale claims and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *Liddy*, 398 Md. at 243–44; *Ross*, 387 Md. at 668; *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 130–31 (1962). Laches may bar a claim in situations where a plaintiff fails to timely assert his or her rights due to his or her own negligence or lack of diligence. *Buxton v. Buxton*, 363 Md. 634, 644 (2001).

In other words, the doctrine of laches is applicable in situations where a party unreasonably delays an assertion of his or her rights that prejudices an opposing party. *Ademiluyi*, 458 Md. at 32; *Liddy*, 398 Md. at 244; *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 117 (2000). If the opposing party is unable to establish that the delay

resulted in prejudice, laches will not bar a purely equitable action. *Schaeffer v. Anne Arundel Cty.*, 338 Md. 75, 83 (1995). Whether prejudice has been established is dependent "upon the facts and circumstances of each case, but it is generally held to be anything that places [an opposing party] in a less favorable position." *Parker*, 230 Md. at 130.

In terms of prejudice, the State Board experienced very little, if any, prejudice. Although this will be discussed in greater detail subsequently, it suffices to indicate that the State Board conceded that it was not prejudiced before the circuit court. However, the State Board indicated that it would be prejudiced if it was left unable to comply with a final order that interfered with the electoral calendar. Clearly, such a situation has been avoided and the State Board has not been prejudiced.

Similarly, Ms. Ademiluyi was not prejudiced by the preliminary injunction or the suit in general. First, Ms. Ademiluyi's candidacy did not comport with the requirements of the Libertarian Party's Constitution or provisions of the Election Law Article provisions for registered Democrats. As noted, the Libertarian Party's Constitution requires that its candidates for such offices be registered members of the party. Whereas, at all relevant times, Ms. Ademiluyi was a registered Democrat.

The record is unclear as to whether the Libertarian Party followed the proper procedures in its Constitution to fulfill the nominating requirements. In selecting a nominee for a county wide office, such as the Circuit Court for Prince George's County, the Constitution provides in Article VII "Nominations for Public Office" as follows:

> Section 2. Local Nominations: Nominations of persons by the Party for local offices (i.e., non-Federal and non-statewide offices) shall be determined by the local Central Committees of the jurisdiction in which the offices are held,

41

in accordance with the Constitutions and Bylaws of the Local Central Committees. Should the Local Central Committee of the corresponding jurisdiction not exist, or not be recognized by the appropriate County or State Board of Election, or the jurisdiction crosses the boundary of more than one such Local Central Committee, or the duly authorized Chairman of an empowered recognized Local Central Committee so request, the State Central Committee may nominate such candidates in the same manner as described in Section 3 of this Article.

The certificate of nomination filed with the Board by the Libertarian Party on June 18, 2018, clearly identifies Ms. Ademiluyi and states that her party affiliation is "DEMOCRAT." The certificate is signed by the Chairman and Secretary of the Libertarian Party, and notes that the "Date of Meeting" was June 7, 2017. No additional information about whether the meeting was a local central committee or a state party convention is provided. In fact, because the Libertarian Party's organizational documents require the candidates it nominates to be registered members of the party, it appears that Ms. Ademiluyi and the Libertarian Party would have to begin the nomination process anew to bring a level of legitimacy to her nomination. Therefore, she could not cure the deficiencies of her nomination solely by changing her party affiliation before the deadline to do so. Moreover, recognizing that the party affiliation of Prince George's County is overwhelmingly Democratic,[33] it is clear that Ms. Ademiluyi's strategy was to conduct a

---

[33] The voter registration activity report of the Board, dated November 2018, provides the following statistics from Prince George's County: Democratic 463,345; Unaffiliated 70,085; Republican 40,703; Libertarian 1,725; and Green 1,069.

campaign as a Democratic candidate after the subterfuge of being nominated by the Libertarian Party.[34]

Overall, Ms. Ademiluyi was not prejudiced because her qualifications as a candidate for judicial office do not comport with the requirements of the Libertarian Party's Constitution and therefore the Election Law Article. A candidate who does not meet the qualifications for a particular office cannot be prejudiced by a judicial challenge to his or her candidacy. Permitting such a candidate to participate in the election would run contrary to the goals underlying our State's regulation of elections and would subvert the purpose of the Election Law Article—to ensure fairness throughout the elective process. *See* EL § 1-201.

This Court has routinely commented that "there is no inflexible rule as to what constitutes, or what does not constitute, laches; hence, its existence must be determined by the facts and circumstances of each case." *Ademiluyi*, 458 Md. at 32 (quoting *Schlakman*, 451 Md. at 485); s*ee also Ross*, 387 Md. at 669; *Buxton*, 363 Md. at 645; *Parker*, 230 Md. at 130. We have previously indicated that, within the context of elections, "any claim

---

[34] Under the Maryland Code of Judicial Conduct, incumbent judges are restricted in their campaign activities and from making campaign statements or promises that would reflect upon their judicial integrity. Specifically, in addition to other rules governing political conduct, an incumbent judge as a candidate "with respect to a case, controversy, or issue that is likely to come before the court, shall not make a commitment, pledge, or promise that is inconsistent with the impartial performance of the adjudicative duties of the office" and "shall not make any statement that would reasonable be expected to affect the outcome or impair the fairness of a matter pending or impending in any court." Md. Rule 18-104.4(d)(3); Md. Rule 18-104.4(d)(4). Challengers who are not incumbent judges do not have any such restrictions on political conduct and campaign statements.

against a state electoral procedure must be expressed expeditiously" and "without unreasonable delay." *Liddy*, 398 Md. at 245 (quoting *Ross*, 387 Md. at 671); s*ee also Ademiluyi*, 458 Md. at 30. In several instances, this Court held that the doctrine of laches has barred claims within the context of elections. *See Ademiluyi*, 458 Md. at 11 (holding that a challenge to a judicial candidate's qualifications brought over six months after the completion of the election was an unreasonable delay and thus barred by laches); *Schlakman*, 451 Md. at 485 (holding that a thirty-six day delay in challenging the qualifications of a candidate for Baltimore City Council was unreasonable and therefore barred by laches); *Ross*, 387 Md. at 668, (holding that a twenty-three day delay in challenging a candidate's qualifications for the Baltimore City Council, after failing to file the necessary financing reports, was unreasonable and barred by laches).

For laches to bar a particular claim, a defendant must generally demonstrate that the opposing party ". . . had knowledge, or the means of knowledge, of the facts which created his cause of action." *Parker*, 230 Md. at 131. Previously, in consideration of the discovery rule and its relation to the limitations period, this Court has indicated:

> [W]hether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury.

*Frederick Rd. Ltd. P'ship v. Brown & Strum*, 360 Md. 76, 96 (2000) (quoting *O'Hara v. Kovens*, 305 Md. 280, 295 (1986)). Therefore, we must determine whether the circuit court clearly erred in finding that Appellees acted diligently in pursuit of their claims.

44

*Schlakman*, 451 Md. at 479 ("We review the factual findings of the lower court for clear error.")

As indicated above, Ms. Ademiluyi filed her nomination papers with the State Board on June 18, 2018. Ten days later, on June 28, the State Board posted information regarding Ms. Ademiluyi's candidacy for judicial office on its website, indicating that she was a candidate only in the 2018 Gubernatorial General Election. Importantly, the website did not indicate Ms. Ademiluyi's political affiliation. Approximately three weeks later, on July 19, Appellees submitted a MPIA request to the State Board, seeking information regarding Ms. Ademiluyi's candidacy. Five days later, on July 24, the State Board returned the requested information to Appellees. The following day, Appellees filed suit in the Circuit Court for Prince George's County.

The present case differs from prior decisions in which we have entertained judicial challenges to the qualifications of candidates for public offices, because it involves Ms. Ademiluyi's party affiliation. In 2017, Ms. Ademiluyi first appeared before this court in a separate judicial election case in which she challenged the qualifications of an attorney who was successful in the 2016 general election in the contest for Judge of the Circuit Court for Prince George's County. *Ademiluyi*, 458 Md. at 9. Ms. Ademiluyi proffered that the successful judicial candidate had never practiced law within Maryland. *Id.* at 9-10. However, Ms. Ademiluyi did not file her lawsuit until more than six months after the 2016 Gubernatorial General Election. *Id.* at 9. In that case, we noted that the judge's background of legal practice is "something that would have been easily ascertainable by Appellant through minimal investigation; i.e., these are facts that would have been readily discernible

45

in today's digital age." *Id.* at 42. Likewise, in *Ross*, the facts that gave rise to the underlying challenge were published in a newspaper article and therefore publicly known on the date of publication. 387 Md. at 667–68.

On prior occasions, this Court has indicated several considerations that should be taken into account when determining whether a party acted diligently or whether the party's claim should be barred by the doctrine of laches. *Abrams* involved a judicial challenge to the candidacy of Thomas Perez concerning whether he satisfied the constitutional requirement that candidates for Attorney General must have practiced law within Maryland for ten years. *Abrams v. Lamone*, 398 Md. 146, 151 (2007). Although the *Abrams* Court did not reach the issue of the statute of limitations, because there was no cross-appeal, the court provided significant insights into the interaction between the statutory limitations of EL § 12-202 and the defense of laches. *Id.* at 161 n.19.

In *Abrams*, this Court expounded that plaintiffs, within the context of judicial challenges to elections, have a certain duty to stay informed. *Id.* at 159 n.18. With regards to the level of diligence required to support an EL § 12-202 claim, the *Abrams* Court commented:

> A reasonable interpretation would place an obligation on a registered voter seeking to challenge the qualifications of a candidate to keep informed as to the relevant acts and omissions of that candidate. A voter may not simply bury his or her head in the sand and, thereby, avoid the triggering of the 10-day statutory time period, prescribed by § 12-202, in which to "seek judicial review from any act or omission relating to an election."

*Id.* at 159 n.18. In considering the sources from which Abrams could have potentially gained information regarding the candidate's qualifications, the Court concluded, "[t]he

46

State Board's website, along with media coverage, would have been the principal places from which Abrams would have been able to find information pertaining to Perez's candidacy. It was incumbent upon Abrams to avail himself of these sources." *Id.*

In contrast, within the instant appeal, there is no indication that Ms. Ademiluyi's party affiliation would have been available to Appellees, even given an exercise of diligence. In fact, considering that there was little to no media attention surrounding Ms. Ademiluyi's candidacy and that the documents revealing Ms. Ademiluyi's party affiliations were in the exclusive possession of the State Board, prior to Appellees' submittal of an MPIA request in July, there is simply no indication that failure to uncover the facts underlying Appellees' challenge resulted from a lack of due diligence on Appellees' behalf. In addition to Ms. Ademiluyi's party affiliation, the MPIA request also sought other information pertinent to Appellees' legal challenge including Ms. Ademiluyi's candidacy documents, campaign committee documents, certificate of nomination, and the Constitution and Bylaws of the Libertarian Party of Maryland.

Therefore, the one-day delay between Appellees' receipt of the requested information from the State Board and filing suit simply cannot be classified as unreasonable. The circuit court was correct in its finding that Appellees "complied as quickly as they could with discovering the question of Ms. Ademiluyi's candidacy." Accordingly, the circuit court did not err in concluding that Appellees' claims were not barred by the statute of limitations or the doctrine of laches, and the circuit court correctly determined that Appellees established they would likely be successful on the merits. Next, we transition in our inquiry to consider the balance of convenience between the parties.

47

We must now determine whether the circuit court abused its discretion in finding that the balance of convenience favored Appellees. In terms of the balance of convenience, we review the circuit court's grant of preliminary injunction to determine whether greater injury would be done to Appellees by the court's grant of preliminary injunction as compared to a denial. *See Schade*, 401 Md. at 36. We shall also consider whether the circuit court's grant of preliminary injunction would result in greater injury to Ms. Ademiluyi and the State Board as compared to the potential injury that would be sustained by Appellees, had the preliminary injunction been denied. *See State Dep't of Health & Mental Hygiene*, 281 Md. at 56.

In the present appeal, the circuit court specifically found that "the likelihood that [Ms. Ademiluyi and the State Board] would suffer some sort of greater injury by granting the injunction is less, even though there is a possibility of appeal, et cetera." Concerning the level of specificity and supporting detail required to buttress a circuit court's finding regarding a particular factor, this Court has indicated that "a trial judge's failure to state each and every consideration or factor in a particular applicable standard does not, absent more, constitute an abuse of discretion, so long as the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion." *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 426–27 (2007) (quoting *Cobrand v. Adventist Healthcare, Inc.*, 149 Md. App. 431, 445 (2003)).

The record clearly demonstrates that a denial of preliminary injunction in this case would cause greater injury to Appellees as compared to Ms. Ademiluyi or the State Board. First, had the circuit court not granted the preliminary injunction, Appellees would have

48

run the risk of having their apparently meritorious challenge to her candidacy become moot prior to adjudication of the issues on the merits. Second, if the preliminary injunction were not granted, the State Board would proceed to certifying the general election ballot, with Ms. Ademiluyi's name included. Twenty-four hours after the State Board's certification of the ballot, the State Board must publicly display the content and arrangement of the ballot on the State Board website. EL § 9-207(c). After the State Board publicly displays the ballot for two days, "the content and arrangement of the ballot may not be modified." EL § 9-207(d).

Although the content and arrangement of the ballot may be judicially challenged pursuant to EL § 9-209 or § 9-208, this Court has previously determined that EL § 9-209 is not the appropriate vehicle for a registered voter to challenge a candidate's eligibility or qualifications. *Ross*, 387 Md. at 666. Further, the term "content and arrangement[,]" within this context, is a narrow one. *Id.* at 665–66. Accordingly, the content of a ballot is limited to statutorily enumerated items including, but not limited to, the name of a candidate provided within his or her certificate of candidacy, instructions to voters, titles of offices up for vote, and party designations for certain candidates. *Id.* at 666; s*ee also* EL § 9-205. As with the arrangement of a ballot, the content of a ballot does not encompass a candidate's qualifications for office. *Ross*, 387 Md. at 665–66. The arrangement of a ballot refers only to the layout and format of the ballot including such things as "the order of offices, candidates' names, the placement of party designations and county of residence if applicable, and the order of questions as they appear on the ballot." *Id.* at 665. Furthermore, we have indicated that the statute is limited to situations in which a voter

49

contests "the inclusion of the name of a candidate who is not certified by the State Board or the exclusion of the name of one who is certified." *Id.* at 667. Therefore, had the circuit court denied Appellees' preliminary injunction, it is more likely than not that Appellees would not have been able to bring their claims and the election would have likely proceeded with Ms. Ademiluyi's name on the ballot.

In terms of injury to the State Board, the State Board conceded before the circuit court that the election calendar did not preclude modification of the ballot. However, the State Board indicated that it would be prejudiced by further delay, if it was unable to comply with a final order without disrupting the election. As evident, the timeliness and outcome of these proceedings have assuaged any such concerns. The State Board was entirely capable of complying with this Courts' order without resulting in any disruption or delay to the 2018 Gubernatorial General Election.

Although Ms. Ademiluyi did not appear before the court below and therefore did not make arguments regarding these issues, it is abundantly clear from the record that the circuit court's grant of preliminary injunction resulted in very little, if any, injury to Ms. Ademiluyi. At its most basic, Ms. Ademiluyi's nomination failed to comport with the requirements established in the Libertarian Party's Constitution. In this respect, Ms. Ademiluyi cannot be injured by the inability to run for a particular judicial office in which she clearly did not meet the necessary qualifications. In addition, based on the statutory framework regulating Maryland's judicial elections, Ms. Ademiluyi was not injured by the circuit court's grant of preliminary injunction. As described above, Ms. Ademiluyi is a registered Democrat and therefore must enter judicial elections through participation in

party primaries. There can be no injury where a judicial candidate, registered as a Democrat, attempts to circumvent participation in the primary election and enter the process through avenues intended for those belonging to non-principal political parties or those unaffiliated with any political party.

In summation, we conclude that the circuit court did not abuse its discretion in its finding regarding the balance of convenience between the parties. The circuit court's determination that the balance of convenience weighed in Appellees' favor is sufficiently supported by the record. Therefore, we must now determine whether Appellees would suffer irreparable injury had the injunction not been granted.

This Court has indicated that for an injury to be considered irreparable, the injury "need not 'be beyond all possibility of compensation in damages, nor need it be very great.'" *El Bey v. Moorish Sci. Temple of America, Inc.*, 362 Md. 339, 355 (2001) (quoting *Washington Nat'l Arena*, 282 Md. at 615.) Irreparable injury is generally found in situations where courts are either unable to determine appropriate monetary damages or where monetary damages are inadequate. *Id.* Further, "an injury may be said to be irreparable when it cannot be measured by any known pecuniary standard." *Dudley v. Hurst*, 67 Md. 44, 52 (1887). In other words,

> an injury is irreparable, within the law of injunctions, where it is of such a character that a fair and reasonable redress may not be had in a court of law, *so that to refuse the injunction would be a denial of justice*—in other words, where, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, it cannot be readily, adequately, and completely compensated for with money.

*State Comm'n on Human Relations v. Talbot Cty. Det. Ctr.*, 370 Md. 115, 140 (2002) (alterations in original) (quoting *El Bey*, 362 Md. at 356).

In the present appeal, had the circuit court denied Appellees' preliminary injunction and Ms. Ademiluyi's name was placed on the general election ballot, it would likely result in irreparable injury to Appellees. Ms. Ademiluyi's nomination was not in accordance with proper election procedure as her qualifications were inconsistent with those required by the Libertarian Party of Maryland's Constitution and therefore violative of EL § 5-701(3). Accordingly, Appellees and all residents of Prince George's County, risked the injury of a judge being elected to the Circuit Court for Prince George's County that lacked the proper qualifications for the nomination. Clearly, this sort of injury could not be redressed by any monetary sum, as it would undermine the integrity of the judicial system, election processes, and nomination procedure. Additionally, although mentioned in our consideration of the balance of convenience, Appellees would likely be devoid of an avenue through which to challenge Ms. Ademiluyi's qualifications and therefore candidacy, had the preliminary injunction not been granted and the election proceeded as scheduled.

Importantly, this does not mean that irreparable injury is always present in situations involving judicial challenges to elections. Aside from our considerations of monetary remuneration, the instant case is unique in that Appellees would likely have no available remedy if the preliminary injunction was denied and they succeeded on the merits in their claim. Based upon deadlines within the election calendar Appellees would have been largely foreclosed from redress. Additionally, although considered within our discussion

52

concerning the likelihood of success on the merits, the fact there were six judicial offices up for election and Ms. Ademiluyi would have been the seventh candidate increases the risk of irreparable harm to Appellees. Therefore, we conclude that the circuit court did not abuse its discretion in determining that the factor of irreparable harm fell in favor of Appellees. Next, we must consider whether the circuit court erred in its determination that granting the preliminary injunction is supported by the relevant public interest.

The circuit court indicated that the public interest at issue within the instant case is one grounded in "maintaining the integrity of our elections." The United States Supreme Court, responding to a constitutional attack upon certain requirements of nominating petitions pursuant to Georgia's election code, recognized that States have an important interest in regulating the number of candidates on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Regarding the public interest at stake, the Supreme Court concluded the following:

> [t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Id.* at 441. In other words, by limiting the number of candidates on the ballot, states "understandably and properly seek[] to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality." *Bullock v. Carter*, 405 U.S. 134, 145 (1972).

The public interests of maintaining integrity, avoiding confusion, deception, and frustration within our judicial electoral process are entirely applicable to the present appeal.

Ms. Ademiluyi's candidacy threatened to undercut these principles of public interest. Specifically, if the preliminary injunction were denied and Ms. Ademiluyi was elected, Prince George's County would be left with an individual holding a judicial office who subverted the statutory nomination process. Likewise, as mentioned before, her candidacy would not comport with the nomination requirements of the Libertarian Party, and therefore, it would cut against the overarching goals of State regulation of elections, i.e. fairness. *See* EL § 1-201. Accordingly, we agree with the circuit court's conclusion that granting the preliminary injunction supports the relevant public interests associated with elections. As the State Board complied with the declaratory judgment and no cross-appeal was noted, there is no need to consider Appellees' claim for writ of mandamus.

In conclusion, we hold that the circuit court did not err in its grant of preliminary injunction. The circuit court's decision was in accordance with the appropriate preliminary injunction factors and its findings are adequately supported by the record.

## CONCLUSION

As indicated by the *per curiam* order filed by this Court on September 6, 2018, we hold that the circuit court did not err in granting Appellees' preliminary injunction. For two reasons, we conclude that Ms. Ademiluyi's candidacy is impermissible under the relevant provisions that regulate judicial elections in Maryland: (i) her candidacy is at odds with the Libertarian Party's Constitution, which requires all of its candidates for public office to be registered members of the party; and (ii) a judicial candidate's route to access the ballot is dependent upon his or her party affiliation—candidates registered with a principal party may only achieve this end through participation in primary elections. The

54

circuit court correctly determined that the preliminary injunction factors (i.e. likelihood of success on the merits, the balance of convenience, irreparable injury, and public interest) weighed in favor of Appellees and supported the circuit court's grant of preliminary injunction. Ms. Ademiluyi was not prejudiced by the circuit court's order because her candidacy failed to comport with the requirements of the Election Law Article. Further, we hold that the statute of limitations and laches do not act to bar Appellees' claims because Appellees acted diligently and pursued their claims expeditiously. Accordingly, we affirm the judgment of the circuit court.

Judge Watts joins in judgment only.